GEORGE L. BROWN, petitioner-appellant,

*v.*

HAROLD C. PARSONS and PRISCILLA PARSONS, defendants-respondents.

[Submitted February term, 1945.   Decided May 10th, 1945.]

*Messrs. Siegler & Siegler,* for the appellant.

*Messrs. Glenn & Glenn (Mr. Alfred T. Glenn, Jr.,* of counsel), for the respondents.

The opinion of the court was delivered by

WELLS, J.

This is an appeal from a decree of the Court of Chancery advised by Advisory Master Erickson dismissing a petition filed by petitioner, George L. Brown, in which he sought the custody of his minor child, Barbara Brown, and asked for the enforcement of that part of the decree of divorce procured by him from his wife, Opal Brown (mother of Barbara), on

May 24th, 1940, in the Circuit Court of the Fifteenth Judicial Circuit of Florida in and for Palm Beach County, which awarded him as an incident of his divorce the custody and control of said child, subject to further order of the court. This suit is brought against the wife's mother, Priscilla Parsons, and stepfather, Harold C. Parsons, with whom the petitioner alleged the child was living in Atlantic City under their custody and control and that they refused to surrender and deliver up said child to petitioner although he was entitled thereto under the decree of said Florida court.

Paragraph 5 of the petition alleged that on or about August 23d, 1943, petitioner was denied visitation and communication with his child at defendants' home in Atlantic City and was actually ejected from their house and threatened with death if he came into the house and that he on that occasion "requested that the infant child be turned over to him so that he could take her back to New York to be brought up in accordance with petitioner's own ideas as to what was best for said infant child."

The petition also alleged that the defendant Harold Parsons was an improper and unfit person to be entrusted with the care, custody and education of the child. The answer admitted the parentage of the child, her age (eight years) and her residence in New Jersey, but denied that she was in the custody and control of the defendants, but stated that she was in the control and custody of her mother, Opal Brown. The answer also denied the allegations of paragraph 5 of the petition which concerned the incident of August 23d, 1943, and denied that Harold C. Parsons was an improper and unfit person to be entrusted with the care, custody and education of said child, but on the other hand charged that petitioner was an unfit and improper person to be so entrusted and alleged that the child was being properly cared for and educated by her mother, Opal Brown, and that the welfare and best interests of the child demand that she remain in the custody of her mother. While the testimony was somewhat contradictory, yet the following facts may be found therefrom: Petitioner married the mother of the child in Philadelphia in October, 1929. He was a pharmacist. They

lived together in Atlantic City until 1932 when they moved to New York City where he was employed for about eight years. In 1934 while living in New York she was pregnant and fainted in church. He became angry and threatened to leave her and wired his wife's mother to come and take her to defendants' home in Atlantic City, which she did.

On July 10th, 1935, the daughter Barbara was born in Atlantic City. Petitioner was informed of his daughter's birth but didn't visit her until more than a month thereafter. He did not pay the hospital bills and for two years after her birth contributed nothing toward her support. The child was supported by her mother and the defendants. In October, 1937, the mother, accompanied by the child, went to New York City for the purpose of persuading the petitioner to establish a home for the child and herself. She remained a month at the home of petitioner's parents with whom he lived, but was so shabbily treated by petitioner and his parents she was forced to leave and obtain a position to support her child and herself, and after several attempts to obtain any support from him she was finally compelled to apply to the Family Court of New York for support of the child, and an order was made which order was fairly regularly obeyed for a period of about two years until he moved to Florida (November, 1939), whereupon he stopped paying the amount fixed by the court or any amount regularly until he was located through the efforts of the New York authorities in Florida.

On May 24th, 1940, petitioner obtained a divorce from his wife in Florida. His wife knew nothing about the divorce proceedings until after the divorce was granted. She received a letter from him dated November 18th, 1940, postmarked "W. Palm Beach Fla.," in which he told her he had just had word that his decree of divorce had become absolute and final as the legal six months' period had elapsed, and he enclosed her a copy of the decree for her use. Then he went on to say, speaking of the paragraph of the decree awarding him the custody of the child, "The final paragraph relating to Barbara need cause you no concern as I have no intention of trying to take her from you at any time provided that she

is permitted to visit me occasionally or I can visit her whenever it is convenient."

He offered as an excuse for having failed to contribute anything towards his child's support since August the fact that he was out of work but promised to do the best he could as soon as he got a job. In the spring of 1941 he returned from Florida to New York and obtained a position in Newark and made irregular payments in small amounts for the support of his child and visited her at the defendants' home about once in every six weeks until August 23d, 1943, when a dispute occurred between him and defendants. In June, 1942, the mother obtained a civil service job in Washington which required her to go there to work in the War Department for which she received $200 per month. She had been unable to find a job in Atlantic City and had herself and child to support and accepted the Washington job. She told petitioner about it, and he said he was very glad of it. She had hoped she could take Barbara to Washington with her, but the housing conditions were acute and the councillors in all the government buildings advised mothers not to bring children to Washington if there was any possible way to have relatives take care of children while the mothers were working in Washington. In this emergency she deemed it much better for Barbara to be in Atlantic City with her grandmother, who is devoted to her and who gives her excellent care. She visits her child at least once and often twice a month. She telephones her once a week, keeps in close touch with her and checks up on her constantly. The child is happy and healthy, devoted to her grandparents, attends church regularly and is one of the honor students in the parochial school.

As to the incident of August 23d, 1943, which petitioner uses as a basis for his suit for custody, Mrs. Parsons' version of it is that on that day petitioner came down to see the child and was very nice. He was invited to have a meal and declined saying he wanted to take Barbara out shopping the next day and would call for her in the morning. Everything was set for him to call, but he failed to do so, and Mrs. Parsons took the child over to the house where the petitioner was

staying and he came out and at first chatted in a friendly way, but finally became sarcastic and a dispute arose during which petitioner said he was going to take the child back with him to New York to live with his mother. Mrs. Parsons insisted that he come to her home to talk the matter over, which he did. When they reached the house, Barbara began to cry and ran to her grandfather and told him her father had come to take her away and begged him not to let him do it. Mr. Parsons, who was a policeman, told petitioner he couldn't take the child, that she didn't want to go and wasn't going with him. Mrs. Parsons called two radio policemen, and they quieted petitioner and advised him that he had better go see the proper authorities before he took the child away, and he left. No blows were struck, and no threats were made by anyone except petitioner. Petitioner admitted that this was the only time that the defendants had interfered with his visiting the child. They said he was always made welcome; that he had never before threatened or suggested taking the child away from them or her mother.

In less than thirty days after this dispute, petitioner filed his petition. The child never lived with her father; he never provided her with a home, never contributed except to a small extent to her support. At the time of the Florida divorce proceedings she was a resident of and domiciled in New Jersey where she has since remained either with her mother or her maternal grandmother under the mother's supervision.

Counsel for petitioner in his brief makes three points; first that the Chancery Court of New Jersey is bound to give full faith and credit to the Florida decree, article 4, section 1 of the Constitution of the United States, which provides that: "Full faith and credit shall be given, in each state, to the public acts, records and judicial proceedings of every other state. And the congress may, by general laws, prescribe the manner in which such acts, records and proceedings shall be proved, and the effect thereof."

Inasmuch as the mother was not made a party to the instant proceeding, the Advisory Master did not feel that he was called upon to decide whether the Florida decree was

good as between petitioner and his wife; and as to the provision contained therein concerning the custody of the child, he held that the child was never a resident of the State of Florida and that petitioner had, as hereinbefore related, abandoned her.

The Advisory Master then reached the conclusion, which seems logical, that the petitioner having abandoned his child, the child's residence did not follow his and that there was never even a technical residence of the child in the State of Florida, and, therefore, the Florida court was without jurisdiction to make the adjudication in reference to her custody and that this provision of the decree was a nullity and was not entitled to the benefit of the full faith and credit clause of the federal constitution. With this we are inclined to agree. The testimony was that neither the child nor its mother was present at the divorce proceedings in Florida. The child was not made a party to the Florida suit which was entitled "George L. Brown, plaintiff, v. Opal Brown, defendant." We, however, do not think it necessary to decide whether or not the learned Advisory Master was right in regarding the custody part of the Florida decree a nullity. We have statutes in New Jersey conferring jurisdiction upon the Court of Chancery to direct the custody of minor children in certain cases. The Supreme Court of the United States in *Alaska Packers Association* v. *Industrial Accident Commission of California, 294 U. S. 532; 79 L. Ed. 1044,* held that:

*"Prima facie* every state is entitled to enforce in its own courts its own statutes, lawfully enacted, and one who challenges that right because of the force given to a conflicting statute of another state by the full faith and credit clause assumes the burden of showing, upon some rational basis, that of the conflicting interests involved those of the foreign state are superior to those of the forum."

One of the New Jersey statutes above referred to is *R. S. 9:2–1* which provides:

"After a divorce decree in any other state or country, if minor children of the marriage are inhabitants of this state, the court of chancery, on the petition of either parent, or of a next friend in behalf of the children, such notice being given to parents as the court shall

direct, may make such decree concerning their care, custody, education and maintenance as if the divorce had been obtained in this state. * * *"

Another of such statutes is *R. S. 9:2–2* which provides:

"When the court of chancery has jurisdiction over the custody and maintenance of the minor children of parents divorced, separated or living separate, and such children are natives of this state, or have resided five years within its limits, they shall not be removed out of its jurisdiction against their own consent, if of suitable age to signify the same, nor while under that age without the consent of both parents, unless the court, upon cause shown, shall otherwise order."

There is no question that this child has resided in New Jersey more than five years. Its mother, who while not a party to the proceedings, testified at the hearing that she was unwilling for the petitioner to have the custody of the child or remove her to New York, as he admitted he intended to do. The statutes above cited seem to indicate that the legislature did not consider that children domiciled in this state were subject to the orders or decrees of the courts of another state before which said children had never appeared. As illustrations of this the Advisory Master cited *Rossell* v. *Rossell, 64 N. J. Eq. 21; 53 Atl. Rep. 821; Lippincott* v. *Lippincott, 97 N. J. Eq. 517;* also *In re Erving, 109 N. J. Eq. 294,* wherein Vice-Chancellor Church, in a comprehensive opinion, reviewed the decisions of the courts of our state and other states concerning the custody of children. The opinion, among other things, holds that a decree of a court of one state in divorce proceedings or on *habeas corpus* awarding the custody of a child, which has not actually been before the court and is not within its jurisdiction when the decree is made, "is not entitled to full faith and credit under the federal constitution in another state, or to the effect of *res adjudicata* so as to prevent the court of another state, having jurisdiction under its statutes and common law to determine the custody of such a child in accordance with what, at the time of the application, it shall deem to be for the best interests of the child. *Dixon* v. *Dixon, 76 N. J. Eq. 364,* distinguished."

The Vice-Chancellor also said in *In re Erving, supra:*

"Besides the jurisdiction conferred upon the Court of Chancery by statute, it has authority under its general equity powers to deal with the custody of infants, which authority is in no way dependent upon statute. Its authority is so broad that the permanent custody may be fixed even in disregard of the legal rights of parents where the welfare of children requires it. *Richards* v. *Collins, 45 N. J. Eq. 283; Kopcinski* v. *Richardson, 94 Atl. Rep. 32; Buckley* v. *Perrine, 54 N. J. Eq. 285; Cole* v. *Cole, 89 N. J. Eq. 381.*"

Petitioner stresses a recent case of the United States Supreme Court decided December 21st, 1942, relating to the full faith and credit to be given in divorce cases by the courts of one state to decrees of another state, to wit; *Williams* v. *North Carolina, 317 U. S. 287; 87 L. Ed. 279,* wherein petitioner claims the court abolishes all distinctions so far as the duty to give extraterritorial recognition to a foreign decree of divorce is concerned, and makes the decree of divorce binding in another state irrespective of whether it was rendered by a court of the matrimonial domicile.

Petitioner contends this full faith and credit protection is good for the whole Florida decree including the awarding of the child's custody to him.

The Appellate Division of the Supreme Court of New York, in *In the matter of the Estate of Martha Bingham,* reported in *265 N. Y. 463* of the reports of said court, in a late decision distinguishing the *Williams Case,* and holding it was not controlling in that case, said:

"The policy enunciated in *Lefferts* v. *Lefferts (263 N. Y. 131),* requires the courts of this state to pass upon the *bona fides* of the residences of divorcees. That policy was not impaired by the decision in the *Williams Case,* which expressly reserved the question whether the courts of one state might refuse to recognize the findings of the courts of another state as to domicile. All that the majority purported to do in the *Williams Case* was to overrule *Haddock* v. *Haddock (201 U. S. 562),* and to remove from the question of full faith and credit consideration of the subsidiary question whether the person who had removed from the matrimonial

domicile had wrongfully done so. The Supreme Court of the United States, in the *Williams Case,* did not eliminate domicile as a foundation for jurisdiction."

Petitioner also cites the late Vice-Chancellor Stevens in *Dixon* v. *Dixon, 77 N. J. Eq. 313,* as clearly establishing the principle that a decree made in this state, and one in which the custody and control of children was considered, is entitled to recognition under the full faith and credit clause of the United States Constitution, in that case, the sovereign State of Maine. The facts in the *Dixon Case* are not similar to those in the instant case and the principles of law therein enunciated do not apply. See *In re Erving, supra* (at *pp. 299* to *301*).

Vice-Chancellor Stevens, however, said in another phase of the *Dixon Case,* reported in *76 N. J. Eq. 364; 74 Atl. Rep. 995,* that:

"Where the mother, in such case, commenced an action for divorce in the state to which she removed, the court, in such action, might determine the right to custody of the children on conditions arising since the order of the New Jersey court, but could not base its adjudication on evidence of facts occurring before that order."

Assuming, without deciding, that the petitioner's interpretation of the application of the *Dixon Case* to the instant case is sound, it cannot avail the petitioner in his quest of the custody of the child for the proofs show that changed conditions have arisen since the decree of the Florida court awarding petitioner the custody of the child. A decree or order of any court awarding the custody of a child, however permanent in form, is always temporary in nature and may be changed from time to time as circumstances dictate. Here conditions and circumstances have arisen subsequent to the Florida decree in that, by the letter of petitioner to his wife written after the decree became final, he said he would not take the child from her provided she was permitted to visit him occasionally or he could visit the child whenever it was convenient. The proofs show that neither of these privileges was denied to him. Furthermore, despite petitioner's promise made to the mother of the child in his letter of November

18th, 1940, that he would do all he could for the child and that the mother would find that whenever possible the child would receive all he could give her, his contributions were so irregular and so meagre that the mother had to leave the child under her grandmother's care and go to work in Washington to earn enough to support the child. By petitioner's conduct toward his child since the Florida decree, we think he has waived any right he had to the custody of the child as against its maternal grandmother or its mother. See *Warnecke* v. *Lane, 75 Atl. Rep. 233* (not officially reported).

·The second point raised in the brief of counsel for the petitioner is in reference to the best interests of the child. In a controversy over a child's possession, its welfare will be the paramount consideration in controlling the discretion of the court. The strict right of the parent will be passed by, if a judgment in observance of such right would substitute a worse for a better custodian. *In re Erving, supra; Richards* v. *Collins, 45 N. J. Eq. 283; Cole* v. *Cole, 89 N. J. Eq. 381.* The Advisory Master speaking on this point said:

"Much has been said relative to the character of the defendant, Harold C. Parsons, alleging a conviction of bastardy. As between the petitioner's conviction and sentence to the New Jersey State's Prison, and the conviction of bastardy of the defendant Harold C. Parsons it is hard to say which would be worse and therefore which would be to the best interests of the child, but there is very little before me to show that Harold C. Parsons ever exercised any supervision over the child. The most that can be said is that the child lives in the same house with him."

The Advisory Master found the supervision of the child was still with the child's mother, even though she was employed in the City of Washington, which situation he said had been created entirely by the petitioner, who had abandoned his child.

The petitioner testified that if he is given the custody of the child he would take it to the State of New York to live with his mother, an elderly, sickly woman whose attitude toward the child is not shown, but to whom the mother of the child attributes all her marital troubles. The paternal

grandmother was not sworn. No description of the home to which the child would be taken was presented to the court. The petitioner says that he wants the child's mother to have the custody of the child and not leave her; that she has done a good job with the child. As an alternative, if she can't do this, he wants the child's custody. His past record on support does not bespeak much hope for the future support of the child on his part. His criticism of the present method by which the maternal grandmother is caring for the child is slight, but his main criticism is directed at the stepgrandfather.

The Advisory Master believed that the maternal grandmother, with her daughter's supervision of the child, was making her contribution to the welfare of the child, and was a fit person to have her custody.

The Advisory Master concluded that not only is the policy of the law against the removal of the child, but the best interests of the child would not be served by delivering the custody of the child to the petitioner.

The third point in petitioner's brief is that the mother abandoned the child. The Advisory Master found that there had been no abandonment of the child by the mother and that the best interests of the child will be served by the child's continuing with her mother, and as long as the present conditions exist which make the mother's absence from the home necessary, for the child to be under the supervision of the maternal grandmother. With this we are in accord.

We are of the opinion that the decree denying the custody of the child to petitioner, with the right of visitation to him, as provided therein, and allowance to defendants of costs and counsel fees should be affirmed.

*For affirmance*—The Chief-Justice, Parker, Case, Bodine, Donges, Heher, Perskie, Colie, Wells, Rafferty, Dill, Freund, JJ. 12.

*For reversal*—None.