IN THE MATTER OF THE GUARDIANSHIP OF SEAN MORAN, A MINOR.

Superior Court of New Jersey
Appellate Division

Argued October 5, 1971—Decided October 8, 1971.

Before Judges GOLDMANN, COLLESTER and MINTZ.

*Mr. Eugene T. Radcliffe* argued the cause for appellant John J. Moran (*Messrs. Powell, Davis, Dietz & Colsey,* attorneys).

*Mr. Martin L. Haines* argued the cause for respondent Frieda L. Newberry (*Messrs. Dimon, Haines & Bunting,* attorneys).

The opinion of the court was delivered by

GOLDMANN, P. J. A. D. John J. Moran, as caveator, appeals from a County Court, Probate Division, judgment appointing Frieda L. Newberry guardian of the person and property of infant Sean Moran. John is Sean's paternal uncle; Frieda is his maternal grandmother. The circumstances that led up to this case were tragic.

Sean, then about two years old, was living with his parents, Paul and Patricia Moran, in Hollywood, Florida, when, on January 1, 1970, the father shot and killed the mother and then shot himself, dying the next day after unsuccessful surgery. Grandmother Frieda, then 46, and her third husband Harold Newberry, then 49, were visiting with the Morans at the time. After the shooting Frieda phoned the paternal grandmother, Marie Moran, in Ohio and told her what had happened. Marie said she could not come to Florida. After Paul died, Frieda again spoke to Marie who told her to make funeral arrangements; Frieda later got a call from an Ohio funeral home to ship Paul's body there.

Frieda testified that at the time in question she had talked over the phone from Florida to three or four of the Moran brothers and sisters in Ohio, but none of them came to Florida. Frieda told Marie and the Moran kindred that she was going to take the child to New Jersey. There was no objection. Frieda left Florida with Sean on January 6 and came to Cinnaminson, N. J., where she resided until recently. (Following the grant of guardianship to her, she and her husband, together wtih Sean, moved to Birmingham, Alabama.)

Frieda had her Florida attorney apply to the Florida court for guardianship of Sean, but was unsuccessful because he was told that since Frieda resided in New Jersey, the application should be made in this State.

Frieda subsequently filed a complaint with the Burlington County Surrogate for guardianship of Sean's person and property. Notice was given Marie, the paternal grandmother. John Moran filed a caveat against the grant of guardianship, with the result that an order issued directing the parties in interest to show cause before the Burlington County Court why letters of guardianship should not issue to Frieda. Shortly thereafter Marie, the paternal grandmother, waived any right she might have to guardianship, and prayed that the application of her son John, Sean's natural uncle, be approved. Frieda and her husband, as well as John and his wife, testified at the plenary hearing.

On this appeal John J. Moran claims that Sean was domiciled in Florida; Florida law should therefore be applied, the Burlington County Court should have refused jurisdiction, and he be qualified as guardian by virtue of his being Sean's next-of-kin.

Frieda contends that the appeal should be dismissed for mootness or for practical reasons of comity because Frieda and Sean are no longer domiciled or resident in New Jersey. We are not attracted to this argument. The judgment here under review was handed down by a court which had jurisdiction over the parties and the *res*, Sean then being present and resident in New Jersey.

We find equally unpersuasive John's argument that the County Court should have refused jurisdiction because Sean was a domiciliary of Florida at the time the matter was heard and the judgment entered. 1 *Restatement, Conflict of Laws* 2d, § 22, comment (i) (1971), states that where a child's parents are dead and no guardian of his person has been appointed, the child should acquire a domicile at the home of a grandparent or other person who stands *in loco parentis* to him and with whom he lives—and the cases so hold.

Absent some compelling reason to the contrary, the child's domicil should be in the place to which he is most closely related. The child

should therefore have a domicil at the home of the person who stands *in loco parentis* to him and with whom he lives even though this person is not a blood relative. [at 92]

And see the cases cited to comment (i) at 94–95. The decisions to which we are referred in John's brief are distinguishable on their facts. We therefore conclude that Sean was resident and domiciled in New Jersey at the time letters of guardianship were granted.

John's choice of law argument is equally without merit. The Florida courts eschewed jurisdiction to grant guardianship, for the reason that Frieda and Sean were residents of New Jersey and should resort to the courts here. As noted, the New Jersey court, having had jurisdiction over the parties and the *res,* properly exercised its *parens patriae* jurisdiction. In *Fantony v. Fantony,* 21 *N. J.* 525, 535 (1956), the court expressly found that jurisdiction of a state to regulate the custody of infants found within its territory does not depend upon the parents' domicile. All other things aside, Sean was a resident of New Jersey when the action was brought and decided — and that suffices. *Id.,* at 536.

What we have said, of course, disposes of John's additional argument that the County Court should have refused jurisdiction. Once again, the Florida courts had refused to accept jurisdiction, and everyone concerned was present in New Jersey when the case was heard and determined.

John further contends that he is entitled to guardianship as next-of-kin, since he stands in the nearest degree of consanguinity. He depends upon the statute relating to descent and distribution of intestate property, real and personal, which descends and is to be distributed equally to the next-of-kin in equal degree. Since property can only *descend,* John claims he is a closer next-of-kin than Frieda. To be considered, however, is the traditional table of consanguinity where one counts up from the intestate, one degree for each generation, until one reaches a common ancestor, and then down by one degree for each generation, from ancestor to

claimant. Frieda would then be only two degrees from Sean, and John three.

To apply John's reasoning under the statute of descent and distribution would result in a harsh result. We have always understood that the traditional table of consanguinity controls. Frieda is undoubtedly Sean's nearest blood relative, and therefore should be considered his next-of-kin.

Sean is a child of very tender years and has been in the care of a loving grandmother since January 1970. All other considerations aside, to take him from the shelter of a good home to satisfy the desires of the Morans would not be in Sean's best interests.

Affirmed.