295 N.J. Super. 244 (1996)
684 A.2d 1011
ROSE BLACK,[1] PLAINTIFF-RESPONDENT,
v.
JOSEPH WALKER AND JOAN WALKER, EXECUTRIX OF THE ESTATE OF JOSEPH WALKER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 9, 1996.
Decided November 25, 1996.
*247 Before Judges KING, KEEFE and LOFTUS.
Steven A. Caputo and Jessell Rothman of the New York bar, admitted pro hac vice, attorneys for appellant (Mr. Rothman, on the brief).
Mezey & Mezey, attorneys for respondent (Frederick C. Mezey, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
The trial judge applied New Jersey law in deciding that a New York father had a duty to pay college education support for his child who lived her entire life in New Jersey with her mother. On this appeal the estate of Joseph Walker, through his executrix, Joan Walker, raises seven claims of error to the orders entered in the Family Part relating to the duty of educational support to Hazel Craig, his daughter. These points are:
POINT I  NEW YORK LAW SHOULD HAVE BEEN APPLIED TO DETERMINE THE EXTENT OF DEFENDANT'S SUPPORT OBLIGATIONS.
POINT II  THE ESTATE'S SUPPORT OBLIGATIONS DID NOT SURVIVE THE DEATH OF JOSEPH WALKER.

*248 POINT III  NEITHER WALKER NOR HIS ESTATE ARE OBLIGATED TO PAY HAZEL'S COLLEGE EXPENSES.
POINT IV  PLAINTIFF FAILED TO DEMONSTRATE THAT HAZEL'S ACCEPTANCE TO THE SYRACUSE COLLEGE WAS REASONABLE BASED UPON THE NEWBURGH STANDARDS; THE OBLIGATION OF JOSEPH WALKER OR HIS ESTATE TO CONTRIBUTE TO HAZEL'S COLLEGE EDUCATION SHOULD HAVE BEEN LIMITED TO THE TUITION SHE WOULD HAVE HAD TO PAY AT A NEW JERSEY STATE COLLEGE.
POINT V  A CHILD IS ONLY ENTITLED TO THE REASONABLE COSTS OF A COLLEGE EDUCATION.
POINT VI  THE FAMILY COURT WAS NOT BOUND BY HAZEL'S OR HER PARENT'S CHOICE OF COLLEGES.
POINT VII  THE AWARD OF ATTORNEY'S FEES WAS IMPROPER.
We affirm the decision. In ruling on the father's duty to provide for his daughter's college education, the judge correctly applied New Jersey law. Except for a few weeks, the child lived her entire life in New Jersey. This State's interest was sufficiently dominant in the circumstances to warrant the application of New Jersey law.

I.
In 1975 plaintiff Rose Black (Black) and the now-deceased Dr. Joseph Walker (Walker), were both employed at Mt. Sinai Hospital in Manhattan when they met. Walker was a fellow (an M.D. who had finished residency and was still in advanced training) and Black was a senior nurse. On January 9, 1976 a child named Hazel Craig (Hazel) was born to Black in Manhattan. At that time, Black was a resident of Manhattan. She moved to New Jersey when Hazel was one or two months of age. Walker was then married to a woman other than Black. Although Walker was not present when Hazel was born, he and Black continued to see each other until Hazel was 12 months of age (Walker's account) or 18 months of age (Blacks' account). Walker and Black apparently lived together for an unspecified but brief period in Carteret, Middlesex County, New Jersey.
Black and Hazel remained New Jersey residents from the time Hazel was an infant. Walker was always employed in New York and was always a resident of New York. As the Family Part judge *249 found, Black and Walker "mutually ignored" the issue of visitation: Black did not offer to arrange for Walker to see Hazel, and Walker did not ask her to make such arrangements.
In 1977 Black and Walker executed an agreement with respect to Hazel's support and maintenance. The agreement was drafted and signed in New York State with the assistance of counsel, whom Black retained at the recommendation of Walker. Walker paid for the attorney; Black could not afford to contribute. The 1977 agreement provided:
a. Black was to have sole custody and control over Hazel;
b. Walker was to pay $300 per month, amount to be renegotiated in September 1978;
c. Walker's support obligation was to terminate upon Hazel's death, marriage, emancipation or reaching the age of 18 years, whichever came first;
d. Walker was to pay the lawyer $750 to cover Black's fees;
e. The agreement was to end October 1, 1978;
f. Walker was to obtain a term life-insurance policy in the amount of $30,000, with Black as irrevocable beneficiary.
This 1977 agreement did not mention anything about an obligation to pay for Hazel's college expenses.
In September 1978 Walker and Black executed a second agreement in New York State providing for Hazel's support and maintenance. This second agreement simply extended the 1977 agreement for one year. On May 23, 1980 the parties executed a third agreement in New York State increasing Walker's support obligation to $345 per month. He continued paying that amount through 1992. Neither the second nor third agreements mentioned Hazel's college expenses. Black acknowledged she had read and understood the agreements before signing them. Sometime in 1992 Black asked Walker to increase his monthly support payment but he refused, saying $345 was all he would ever give voluntarily.
In 1993 Walker, a board-certified gastroenterologist, made about $147,000 per year. He had two other children, ages 11 and 14, by his marriage to Joan Walker. At trial in 1994 he acknowledged $736,000 in assets against $32,600 liabilities. As of the date *250 of Walker's death, July 10, 1994, those assets included over $600,000 in a Keogh account and about $35,000 in an IRA. The record discloses substantial life insurance benefits (at least $300,000) payable on Dr. Walker's death.
In August 1984 Black married Roy Black (Roy Black). The Black family, including Hazel Craig, lived in Morris County, New Jersey in a home which they owned. Black testified that her husband Roy, Hazel's stepfather, was Hazel's "father figure" and acted in the place of Walker. Roy Black is a driver for Federal Express with an annual income in 1993 of $39,000. The Blacks filed a joint tax return and claimed a dependent deduction for Hazel. They have no children other than Hazel.
In 1981 Black was diagnosed with narcolepsy and cataplexy. In 1986 she became concerned that her condition could cause her to endanger patients. She left nursing and went to work as a teacher's aide at a cerebral palsy center in Roosevelt Park. In 1991 Black ceased working because of her condition. In 1992 she was approved for Social Security disability. Her diagnosis was changed to a biochemical imbalance known as idiopathic hypersonular syndrome. At time of trial, Black's disability benefit was $887 monthly. Hazel had received an additional $443 monthly in disability benefits until she graduated from high school in June 1994.
Hazel graduated from high school ranking twenty-eighth in a class of 166, which placed her in the eighty-third percentile. She was also elected to the National Honor Society and participated in many school activities. Her score on the Scholastic Aptitude Test (SAT) was 970. When deciding where to apply for college, Hazel consulted her mother and stepfather but did not consult Walker, who had no interest in the matter. The Blacks told Hazel they would try to pay for the portion of her college costs not covered by aid and loans.
Hazel first applied, in November 1993, to Trenton State College (TSC) and William Paterson (Passaic County). Shortly after a judicial ruling on December 13, 1993 that held Walker responsible *251 for Hazel's college costs, she applied to Syracuse University, a more expensive institution, her first choice of colleges. Six colleges accepted Hazel: William Paterson, St. John's (New York City), Seton Hall (Newark area), Northeastern (Boston), Hofstra (Long Island) and Syracuse University (New York State). Syracuse offered her admission to the College of Arts and Sciences, which accepts 75% of those who apply but did not accept her to its prized Newhouse School of Communications, which she apparently preferred. She hoped to do well in the college and transfer into the Newhouse School after her sophomore year. She was rejected by TSC, James Madison (Virginia), and the University of North Carolina.
For Hazel's first year in college, Syracuse offered her $2,600 in aid and $2,000 through a work-study project. Hazel agreed to work about ten hours a week in the work-study program. Subtracting this aid from Syracuse's then-total cost of about $24,000, Hazel needed another $19,400 to attend Syracuse. That sum included tuition, activities fees, room & board, supplies, and estimated personal and travel expenses.
Walker died unexpectedly on July 10, 1994 leaving as survivors his wife Joan and their two children. His will appointed his wife as executrix. Joan Walker works as a school teacher. Her income is not available in the record.

II.
On June 7, 1993 Black commenced a proceeding against Walker in the Superior Court, Chancery Division, Family Part. Black sought to compel Walker to: (1) extend child support payments; (2) contribute to Hazel's college expenses; (3) procure life insurance for Hazel's benefit, and (4) pay for certain past medical expenses.
On September 13, 1993 the judge granted Walker's motion to admit New York counsel pro hac vice. On February 16, 1994 the judge ordered Walker to continue paying $345 monthly directly to Black, reimburse Black $1,250 for Hazel's orthodontic expenses, *252 and contribute to Hazel's future college expenses in an amount for future determination.
The Family Part judge conducted plenary hearings at Walker's request and rendered an oral opinion on the record on July 7, 1994. Black was to submit a written order for the judge's signature. Before that order was executed Walker died on July 10, 1994. The judge was so advised on July 11, 1994. Walker's attorney maintained the Family Part had no jurisdiction to execute an order until a representative was appointed for Walker's estate, pursuant to R. 4:34. The judge disagreed. On July 21, 1994 Black applied for counsel fees. Walker's attorney objected because the court lacked jurisdiction until Walker's estate was formalized. He also claimed that counsel fees could not be awarded in a summary proceeding. On August 4, 1994 the judge granted Black's application for counsel fees and costs of $11,919.
In October 1994, temporary letters testamentary were issued in the Surrogate's Court of Nassau County (Long Island), State of New York, in connection with Walker's estate (the Estate). On October 7, 1994 the Estate, claiming authority under its temporary letters, moved to vacate the New Jersey Family Part judge's orders of July 7, 1994 (directing Walker to pay college costs), August 2, 1994 (granting Black leave to apply for attorneys fees), and August 8, 1994 (directing Walker to pay Black's attorneys fees). The Estate also moved to substitute itself for Walker as defendant. On October 12, 1994 the judge denied the motion on all points.
The Estate then moved before this court to substitute itself for Walker as defendant, for a stay, and for other relief not apparent from the record. On November 7, 1994 we ruled on this motion, in pertinent part, as follows:
This matter ... [is] remanded to the Chancery Division, Family Part. In view of the death of Joseph Walker on July 10, 1994, the Family Part is directed: (1) to promptly review the matter and reconsider, if necessary, in light of the death of Joseph Walker, any orders previously entered, (2) consider an application for substitution of an appropriate representative party for the decedent upon proper *253 proofs, (3) hear any application for a stay of the orders for judgment, and (4) set the terms of any security for payment of any judgment, pending appeal.
On remand, Judge Plechner declined to alter his previous findings. Following a series of proceedings, the judge rendered a final decision on August 22, 1995. That decision substituted the Estate's executrix, Joan Walker, for decedent, Joseph Walker as defendant and directed the Estate to pay: 90% of Hazel's college expenses (Black to pay 10%); $17,460 college costs in arrears in ten monthly installments of $1,746, except during July and August when the Estate was to pay $345 support for Hazel; and $1,250 orthodontic expenses. An order of October 17, 1995 awarded $11,940 additional counsel fees and costs to Black's attorneys.

III.
We reject the Estate's contention that the judge erred in applying New Jersey law to determine the extent of Walker's support obligation. The Estate argues the judge should have applied New York law, which, it claims, imposes no duty to pay for Hazel's college expenses, certainly not after Walker's death. Since New Jersey was the forum, New Jersey choice-of-law principles determine which law applies. See McBride v. Minstar, Inc., 283 N.J. Super. 471, 481-82, 662 A.2d 592 (Law Div. 1994), aff'd, 283 N.J. Super. 422, 662 A.2d 567 (App.Div. 1995), certif. denied, 143 N.J. 319, 670 A.2d 1061 (1995).
Although Black and Walker voluntarily executed three child-support agreements in New York State with the help of New York counsel, contract principles are not necessarily controlling in New Jersey's law of matrimonial or parent-child relations. See Massar v. Massar, 279 N.J. Super. 89, 94, 652 A.2d 219 (App.Div. 1995) (declining to adopt a per se rule of enforceability of negotiated agreements between spouses); Blum v. Ader, 279 N.J. Super. 1, 4, 652 A.2d 176 (App.Div. 1994) (stating parties cannot bargain away child's rights). To the extent contract principles are consulted for guidance, the traditional contract choice-of-law rule suggests construing the agreements' terms under the lex loci contractus, *254 the law of New York. New Jersey, however, has rejected the traditional view that the law of the place of contracting automatically and conclusively determines the parties' rights and duties. Gilbert Spruance v. Pennsylvania Manufacturers, 134 N.J. 96, 102, 629 A.2d 885 (1993); State Farm Mut. Ins. Co. v. Simmons' Estate, 84 N.J. 28, 36, 417 A.2d 488 (1980).
New Jersey applies a more flexible approach focusing on the jurisdiction which has the most significant relevant contacts with the parties and the subject matter of the agreement. Gilbert Spruance, 134 N.J. at 102, 629 A.2d 885; State Farm, 84 N.J. at 37, 417 A.2d 488; Bedwell & Sons, Inc. v. Geppert Bros., Inc., 280 N.J. Super. 391, 395, 655 A.2d 483 (App.Div. 1995); Bell v. Merchants & Businessmen's Mutual Ins. Co., 241 N.J. Super. 557, 561-62, 575 A.2d 878 (App.Div.), certif. denied, 122 N.J. 395, 585 A.2d 395 (1990). Cf. Pfau v. Trent Aluminum Co., 55 N.J. 511, 263 A.2d 129 (1970) (in the tort context where an automobile accident occurred in Iowa involving Connecticut passenger and New Jersey driver of vehicle registered in New Jersey, Iowa had insufficient interest in having its "guest statute" applied). Because the law of the contracting site generally comports with parties' reasonable expectations concerning the principal situs of the transaction, that forum's law should be applied "unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield," generally referred to as the "most-significant interest test" or "government interest test." Gilbert Spruance, 134 N.J. at 102, 629 A.2d 885 (quoting State Farm, 84 N.J. at 37, 417 A.2d 488); see also Bedwell, 280 N.J. Super. at 395, 655 A.2d 483; Huffmaster v. Robinson, 221 N.J. Super. 315, 534 A.2d 435 (Law Div. 1986); Restatement (Second) of Conflicts of Laws, Section 188 (1971) (Restatement). The Restatement lists several factors germane to such a choice-of-law analysis, including: the relevant policies of the forum; the relevant policies of other interested states and the states' relative interests in the determination of the particular issue; the protection of justified expectations; the basic *255 policies underlying the field of law; certainty, predictability and uniformity of result; and ease in determining and applying the law to be applied. Restatement Section 6. The most-significant-relationship test calls for an evaluation according to the relative importance of several relevant contacts, such as the domicile of the parties, the place of contracting, and the place of performance. Restatement Section 188. See, e.g., Bernick v. Frost, 210 N.J. Super. 397, 510 A.2d 56 (App.Div.), certif. denied, 105 N.J. 511, 523 A.2d 158 (1986) (applying New Jersey law to out-of-state issues because of this State's dominant and significant relationship). The qualitative nature of each jurisdiction's contacts, not their quantity, is dispositive. Haggerty v. Cedeno, 279 N.J. Super. 607, 611, 653 A.2d 1166 (App.Div.), certif. denied, 141 N.J. 98, 660 A.2d 1197 (1995) (quoting Veazey v. Doremus, 103 N.J. 244, 247-48, 510 A.2d 1187 (1986)); see also Gantes v. Kason, 145 N.J. 478, 484, 679 A.2d 106 (1996).
If the Black-Walker agreements had actually addressed Walker's duty to pay for Hazel's college education, the fact that they signed those agreements in New York might be a factor favoring application of New York law. See Public Service Coordinated Transport v. Marlo Trucking Co., Inc., 108 N.J. Super. 232, 236, 260 A.2d 855 (App.Div. 1970) (holding where insurance contract was made in New York, and driver, attorney and company's principal place of business were all in New York, New York law governed even though the accident occurred in New Jersey). Application of New York law might also be favored, though to a lesser extent, because all the agreements apparently were drafted with the assistance of New York counsel. But those agreements never stated anything about whether Walker had a duty to provide for Hazel's college expenses. Thus any "contacts" New York had with the voluntary agreements are not particularly relevant to the matter at hand and are not essential to the choice-of-law analysis. Only relevant contacts influence the choice-of-law. See, e.g., Veazey v. Doremus, 103 N.J. 244, 249, 510 A.2d 1187 (1986) (holding although New Jersey had interest in deterring *256 negligent driving on its highways, that interest was unrelated to interspousal immunity).
Indeed, there is no certainty our courts would honor the parties' agreement even if it purported to define the scope of Walker's duty to pay college expenses. In Blum v. Ader, 279 N.J. Super. 1, 3-4, 652 A.2d 176 (App.Div. 1994), for instance, a young woman who resided with her mother in New Jersey since 1988 sought to require her father, apparently a Delaware resident, to contribute towards her education at Seton Hall University in New Jersey. There, as here, the parties had voluntarily executed an agreement which did not speak to either party's duty to pay for college expenses. Id. at 3, 652 A.2d 176. Unlike the Black-Walker agreement, the Blum v. Ader agreement specifically provided that Delaware law would govern. Under Delaware law the father had no duty to pay for higher education. Nonetheless, we held,
Even if the parties' choice of law provision in their separation agreement was intended by them to govern their obligation to pay for their children's higher education if still residents of Delaware, we would not enforce such a provision as it applied to a New Jersey resident child.
[Id. at 4, 652 A.2d 176.]
If New Jersey had a strong interest in seeing that the Blum child, a six-year resident of our State, receive college funding from her father, New Jersey has a stronger interest in ensuring that Hazel, a lifelong resident of New Jersey, receive such funding from her father's estate, if adequate. This interest is so compelling that it has been recognized by our Legislature in N.J.S.A. 2A:34-23(a)(5): "Need and capacity of the child for education, including higher education," and expressed unequivocally by our Supreme Court: "[F]inancially capable parents should contribute to the higher education of children who are qualified students." Newburgh v. Arrigo, 88 N.J. 529, 544, 443 A.2d 1031 (1982).
Although the importance of this express public policy alone might be enough to tip the scales in favor of applying New Jersey law, other family-law precedent outside the context of the right to college funding, confirms the overriding weight our courts ascribe to a child's New Jersey domicile and residency in the choice-of-law *257 analysis. In In re Moran, 116 N.J. Super. 238, 240, 281 A.2d 816 (App.Div. 1971), for example, a married couple died in Florida and their infant child came into the care of his maternal grandmother, who lived in Cinnaminson, Burlington County, from January 1970 until sometime in mid-1971. A dispute ensued when a paternal uncle asserted his right to serve as guardian of the infant, and the Burlington County Court, Probate Division, granted guardianship to the maternal grandmother. Very shortly thereafter, the grandmother and infant left New Jersey for Birmingham, Alabama (for this the record provided no explanation). Concluding that New Jersey law governed the competing claims of the would-be guardians, this court reasoned, "[the infant] was a resident of New Jersey when the action was brought and decided  and that suffices." Moran, 116 N.J. Super. at 242, 281 A.2d 816 (citation omitted). Fifteen years earlier, in an opinion relied upon by the Moran court, our Supreme Court flatly stated, the "jurisdiction of a state to regulate the custody of infants within its territory does not depend upon the domicile of the parents. It has its origin in the protection that is due to the incompetent or helpless, and our jurisdiction parens patriae is firmly established in our jurisprudence...." Fantony v. Fantony, 21 N.J. 525, 535, 122 A.2d 593 (1956) (citations omitted); Brown v. Parsons, 136 N.J. Eq. 493, 500, 501, 42 A.2d 852 (E. & A. 1945). Adapting this longstanding principle to the present situation, New Jersey's interest in ensuring that Hazel receives college funding is but one incident of its right and duty, as parens patriae, to safeguard the welfare of minors within its borders.
Because Walker was a long-term domiciliary of New York and Hazel was conceived and born in New York, the "balancing" of relevant contacts for choice-of-law analysis is not an "open-and-shut" exercise. The Estate also seems to suggest that Syracuse University's location in New York is a relevant contact favoring application of New York law. Ironically, Dr. Walker spent his first two years of medical school at Syracuse University. He attended Mt. Sinai for his last two years. Nonetheless, the Estate's duty to pay Hazel's college expenses is better governed *258 by the law of the state where she has lived almost since birth. Cf. In re Adoption by T.W.C., 270 N.J. Super. 225, 636 A.2d 1083 (App.Div. 1994) (applying New Jersey law to allow non-resident natural mother to revoke consent to interstate adoption where adopted child had no home state, even though consent agreement was executed in New York).
The Estate also urges that "choosing the law of the child's domicile would produce anomalous and inconsistent results where, as here, the children of a parent live in different states and these states have different laws concerning the nature and extent of support obligations." New York assertedly provides that a support obligation dies with the supporting parent, while New Jersey authorizes equitable continuation of a support duty past death. Specifically, the Estate, relying on Keehn v. Keehn, 137 A.D.2d 493, 524 N.Y.S.2d 238 (App.Div. 1988),[2] expresses concern that Hazel will have a claim for college expenses against her father's estate, "put[ting] her at an advantage over the children born of *259 the marriage of Joseph Walker and Joan Walker," who cannot make such a claim under the law of their home state, New York.
This is not an unreasonable concern. But this anomaly is unavoidable in a federal system such as ours. The several states have always had, and probably always will have, differing substantive law defining the scope of parents' duties to their children. While diversity may lead to "anomalous" results, this incongruity is part of the price of vesting the people and the government of each state with a voice in traditionally local matters like family law. To the extent that the Commerce Clause and the Tenth Amendment allow, of course, Congress can enact legislation diminishing the variation in the support obligations imposed by the states. But such law reform must be pursued in the political or legislative arena, not in the courts. Congress has not yet passed measures ensuring that children of the same parent are entitled to the same support for higher education, wherever they live. Absent a viable constitutional challenge, which the Estate does not mount, children living in different states may possibly be treated unequally vis-a-vis a common parent.
There is a second point concerning the Estate's "anomaly" argument. The Estate argues that applying the law of the child's domicile will yield anomalous results. Implicit in that argument is the premise that applying the law of the supporting parent's domicile would not produce anomalous results. That premise is untenable. Even if we applied the latter choice-of-law rule, anomalies would persist. Posit two children living next-door to one another in New York City their entire lives, each with a supporting parent in Mississippi and Philadelphia, respectively. Under the Estate's proposed approach, these children could be entitled to widely divergent levels of support even though they are otherwise presumably afforded the same protection by their home states' laws.
Finally, the Estate argues that applying New York law to the present dispute would not offend New Jersey's public policy. It *260 points out that the Uniform Reciprocal Enforcement of Support Act (URESA), which New Jersey has adopted, provides that:
[D]uties of support applicable under this act are those imposed under the laws of any state where the obligor was present for the period during which support is sought. The obligor is presumed to have been present in the responding state during the period for which support is sought until otherwise shown.
[N.J.S.A. 2A:4-30.31.]
The Act also provides procedures by which an out-of-state support order may be registered in New Jersey and officially recognized by our courts. See, e.g., Essex County Adjuster on Behalf of State of California v. Brookes, 198 N.J. Super. 109, 486 A.2d 875 (App. Div. 1984). The Estate infers from New Jersey's enactment of these provisions that New Jersey "has expressed a policy for the law of the [supporting parent]'s domicile to govern in multi-state support proceedings even where the children are domiciled in New Jersey." Many expressions of state policy exist, Vasquez v. Glassboro Serv. Ass'n., 83 N.J. 86, 98, 415 A.2d 1156 (1980), and legislation, of course, should be considered as a paramount expression.
New Jersey's adoption of URESA does bespeak a willingness to defer to our neighboring states' substantive law on parental support duties in certain circumstances. The quoted provision applies only where a party seeks to enforce a properly registered out-of-state support order in a New Jersey court. Under such circumstances New Jersey has agreed to forego applying its own support laws in return for other URESA signatories' courts doing the same when presented with a New Jersey support order. URESA signifies New Jersey's willingness to "trade" its substantive family support law in some instances with the understanding that others will reciprocate. Where, as here, there is no sister-state support order involved, there is no compelling reason for New Jersey to surrender the opportunity to apply its own support law to a case in which it has very substantial relevant contacts. No support order is involved except the one issued by our Chancery Division's Family Part; considerations of interstate, mutual cooperation and comity are not implicated.
*261 Applying New Jersey law here in no way hinders the goal of preventing support enforcement from becoming an impractical patchwork of competing judgments as family members move from state to state. URESA is inapposite by analogy and New Jersey policy mandates application of this State's child support law. The trial judge did not err in concluding New Jersey law governs the duty of Walker and his Estate to contribute substantially to the cost of Hazel's college education.

IV.
As discussed in III, New Jersey law governs Walker's or his Estate's obligation to contribute towards Hazel's college expenses. We conclude it does not matter that the Estate could have no such obligation under New York law because our Supreme Court declared, in the context of a divorce:
The statute [N.J.S.A. 2A:34-23] does not deal in explicit terms with the power to provide for the continued support of children after the death of their father, nor does any prior holding of this Court dispose of the matter. However, there are pertinent out-of-state decisions under general statutory provisions comparable to our own; they are not uniform but many of them and those most persuasive to us broadly recognize the court's power to assure continued support for minor children after [the supporting parent]'s death.
[Grotsky v. Grotsky, 58 N.J. 354, 357, 277 A.2d 535 (1971).]
Reasoning that N.J.S.A. 2A:34-23 should be liberally construed, the Court held, "where the circumstances equitably call for such action, the court may enter a support order for minor children to survive their father's death." Id. at 361, 277 A.2d 535. Previously this court held that support and alimony obligations died with the obligor. Modell v. Modell, 23 N.J. Super. 60, 62, 92 A.2d 505 (App.Div. 1952). "Modell, however, has been whittled away by subsequent case law." Jacobitti v. Jacobitti, 135 N.J. 571, 576, 641 A.2d 535 (1994). The Grotsky ruling has been cited and followed numerous times in the intervening quarter-century. See Travelers Ins. Co. v. Johnson, 579 F. Supp. 1457, 1463 (D.N.J. 1984); Jacobitti v. Jacobitti, 135 N.J. at 576-77, 641 A.2d 535; Miko v. Miko, 283 N.J. Super. 287, 293-94, 661 A.2d 859 (Law Div. 1994) (defendant father's survivorship benefits may be attached *262 to fund wife's support arrearages); C. v. R., 169 N.J. Super. 168, 172, 404 A.2d 366 (Ch.Div. 1979).
This court has endorsed the equitable authority recognized in Grotsky. In Koidl v. Schreiber, 214 N.J. Super. 513, 520 A.2d 759 (App.Div. 1986), a man died while subject to a child-support order, making no provision for his child in his will. The trial judge entered an order terminating the father's support obligation as of the date of his death. We reversed, relying on Grotsky and N.J.S.A. 9:17-53, which requires parents to provide for the support of their illegitimate children. We held it error for the trial judge to automatically terminate the support order, and remanded for a determination whether the circumstances called for the equitable continuation of the support order beyond the father's death. Koidl, 214 N.J. Super. at 515-16, 520 A.2d 759. Indeed, as the Koidl court remarked, if a divorced parent's duty to support a child may be continued after his death, there is "no reason why the same should not be true" where the parents were never married. Koidl, 214 N.J. Super. at 515, 520 A.2d 759. As this court has noted, the contrary holding  treating the children of never-married parents differently than the children of divorced parents for this purpose  could be constitutionally infirm. DeCeglia v. Estate of Colletti, 265 N.J. Super. 128, 137, 625 A.2d 590 (App.Div. 1993) (citing, inter alia, Clark v. Jeter, 486 U.S. 456, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (Equal Protection Clause violated by imposing six-year statute of limitations for illegitimate children to prove paternity as required to seek support, where legitimate children may seek support at any time)). Indeed, other legislation suggests that continuing support obligations posthumously would not offend the Legislature's design in this context. N.J.S.A. 9:17-45(c) states that the death of an alleged father "shall not cause abatement of any action to establish paternity, and an action to determine the existence or nonexistence of the parent and child relationship may be instituted or continued against [his] estate or [his] legal representative...." Further, the Estate's obligation to support Hazel's education is not necessarily controlled by the fact that Walker never attempted to have *263 a qualitative father-daughter relationship with Hazel. Martinetti v. Hickman, 261 N.J. Super. 508, 513, 619 A.2d 599 (App.Div. 1993); see Pascale v. Pascale, 140 N.J. 583, 591, 660 A.2d 485 (1995) (citing Martinetti). This is but one factor in the analysis. Cf. Moss v. Nedas, 289 N.J. Super. 352, 674 A.2d 174 (App.Div. 1996) (because father's interest in child's college plans were snubbed, father not obligated to contribute). In contrast to the father in Moss, Dr. Walker never evinced a desire even to see Hazel since her birth.
We conclude the trial judge equitably exercised his sound discretion on this record in ordering Walker's estate to contribute substantially towards Hazel's college costs. The record reveals that Walker left adequate resources to justify this order, taking into account the needs of the younger two Walker children. The trial judge expressed the opinion that there were sufficient income and assets to satisfy the judgment. The record before us supports his conclusion. If changed circumstances suggest otherwise, the Estate may make an appropriate Lepis v. Lepis, 83 N.J. 139, 416 A.2d 45 (1980), application.

V.
Finally, we conclude that there is ample credible evidence in the record to support the judge's finding that (1) Hazel's decision to matriculate at Syracuse University was reasonable under the circumstances, N.J.S.A. 2A:34-23(a)(5); Newburgh v. Arrigo, 88 N.J. 529, 443 A.2d 1031 (1982) and (2) the award of counsel fees also was reasonable under the circumstances, which included defendant's persistent and intractable resistance to Hazel's claim and her limited resources to pay counsel to press her case. When asked to contribute to Hazel's college education he told her mother that he was not interested and said "take me to court." R. 4:42-9(a)(1); Williams v. Williams, 59 N.J. 229, 233, 281 A.2d 273 (1971); Rova Farms Resort, Inc. v. Investors Ins. of America, 65 N.J. 474, 483-84, 323 A.2d 495 (1974).
Affirmed.
NOTES
[1] All names used in this opinion are fictitious in order to protect the privacy of the parties.
[2] The court in Keehn v. Keehn said in pertinent part:

The court also directed the defendant to pay the college tuition of all three children of the marriage. This court has stated that, "[A]bsent `special circumstances', or a voluntary agreement, the furnishing of a private school college education to one's minor children is not regarded as a necessary expense for which a father can be obligated (see, Matter of Hawley v. Doucette, 43 A.D.2d 713, 714, 349 N.Y.S.2d 801; Halsted v. Halsted, 228 App. Div. 298, 299, 239 N.Y.S. 422). The factors relevant to the determination of `special circumstances' are threefold: (1) the educational background of the parents; (2) the child's academic ability; and (3) the father's financial ability to provide the necessary funds" (Kaplan v. Wallshein, 57 A.D.2d 828, 829, 394 N.Y.S.2d 439; see also, Antis v. Antis, 108 A.D.2d 889, 485 N.Y.S.2d 770). Based upon the circumstances of this case we find that the defendant's financial status is not such that he should be directed to pay the college tuition of his children. In addition, we note that at the time of the judgment the defendant's youngest son, Jay, was only 14 years of age and, therefore, the order directing the defendant to pay Jay's college tuition was premature since "college is several years away, and no evidence was presented as to his academic interest, ability, possible choice of college, or what his expenses might be." (Whittaker v. Feldman, 113 A.D.2d 809, 811, 493 N.Y.S.2d 375). [137 A.D.2d at 497, 524 N.Y.S.2d at 241-42.]