

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-18-2007

# Warriner v. Stanton

Precedential or Non-Precedential: Precedential

Docket No. 05-3435

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Warriner v. Stanton" (2007). *2007 Decisions.* Paper 1703.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1703

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-3435

———

ROBERT TROY WARRINER, JR.,
by his guardian ad litems
R. Troy Warriner, Sr. and Teresa Warriner;
R. TROY WARRINER, SR.;
TERESA WARRINER, individually,

Appellants

v.

ROBERT P. STANTON, M.D.;
ALFRED I. DUPONT HOSPITAL
FOR CHILDREN OF THE DE NEMOURS
FOUNDATION a/k/a ALFRED I. DUPONT HOSPITAL
FOR CHILDREN; ALFRED I. DUPONT INSTITUTE
OF THE NEMOURS FOUNDATION;
THE NEMOURS FOUNDATION, INC.

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 03-cv-02211)
District Judge:  Honorable Jerome B. Simandle

———

Argued September 11, 2006
Before:  FUENTES, FISHER and BRIGHT,[*] *Circuit Judges*.

(Filed  January 18, 2007)

Gerarld A. McHugh, Jr.
Martina W. McLaughlin (Argued)
Raynes, McCarty, Binder, Ross & Mundy
1845 Walnut Street, Suite 2000
Philadelphia, PA  19103
         *Attorneys for Appellants*

Andrew R. Rogoff (Argued)
Pepper Hamilton
18th and Arch Streets
3000 Two Logan Square
Philadelphia, PA  19103
         *Attorney for Appellee*

OPINION OF THE COURT

FISHER, *Circuit Judge*.

This is an appeal from an order of the District Court for the District of New Jersey granting the defendant's motion for

---

[*]The Honorable Myron H. Bright, United States Circuit Judge for the Eighth Circuit, sitting by designation.

summary judgment in a diversity action. The sole issue presented on appeal is whether the District Court erred in its choice of law analysis. Applying New Jersey's "governmental interest" test, which requires a court to consider the nature and magnitude of each state's interest in having its law govern a particular issue, the District Court concluded Delaware had a stronger interest than New Jersey in seeing its tort statute of limitations applied to the medical malpractice claim in this case. Consequently, it dismissed the plaintiffs' claim as time-barred under the Delaware statute. For the reasons stated below, we will affirm the judgment of the District Court.

## I. Factual and Procedural History

Robert Troy Warriner, Jr., a New Jersey resident, was born in 1989 with a physical deformity called talipes equinovarus, more commonly known as "club foot." This condition was first diagnosed twelve days after Warriner's birth by physician Robert Stanton, a specialist in pediatric orthopedic surgery at the Alfred I. duPont Hospital for Children ("DuPont Children's Hospital") in Wilmington, Delaware. DuPont Children's Hospital is owned by The Nemours Foundation, Inc. ("Nemours").[1] Over the next several years, between 1989 and 1996, Warriner underwent multiple corrective surgeries performed by Dr. Stanton at DuPont Children's Hospital. Warriner's suit centers on a final surgery performed in December of 1996. That surgery involved a procedure called

---

[1]The Nemours Foundation is a non-profit organization created by philanthropist Alfred I. du Pont in 1936. It owns and operates the Hospital for Children in Wilmington, Delaware, as well as The Nemours Children's Clinic in Pensacola, Florida.

"bilateral tibia and fibula anterior closing wedge osteotomies," which Warriner's parents believed would allow Warriner to walk independently. The Warriners allege the surgery was "inappropriately designed" and resulted in an overcorrection that further hampered their son's ability to walk. In the aftermath, Warriner has undergone additional surgeries and physical therapy.

In January of 2003, Warriner, by guardians *ad litem*, filed a complaint for medical malpractice in New Jersey state court against Dr. Stanton and his employer, Nemours. Dr. Stanton was dismissed from the case by agreement of the parties. Nemours removed the case to federal court and filed a motion to dismiss on the basis that the case was barred by Delaware's tort statute of limitations. The parties entered into a stipulation of undisputed facts to aid the District Court in determining whether New Jersey's or Delaware's statute of limitations should apply. That stipulation established the following additional facts. In 1995, Dr. Stanton became licensed in New Jersey at the instruction of his employer Nemours in order to facilitate payments from the State of New Jersey for treatment rendered to New Jersey residents. Dr. Stanton continues to be licensed in New Jersey and, in order to maintain his license, he takes continuing education classes each year. Nemours continues to pay Dr. Stanton's annual renewal fees and he last renewed his license in 2003.

In addition, from September 1998 through May 2001, Dr. Stanton worked as a pediatric specialist with a widely publicized new health program opened by Nemours in southern New Jersey. Dr. Stanton was listed in a professional journal in 2001 as an orthopedic specialist available for appointments at the

4

facility. Since 1995, Dr. Stanton has provided medical treatment to nearly two thousand New Jersey residents at the southern New Jersey facility, The Nemours Children's Clinic in Wilmington, and affiliated sites. Dr. Stanton received his medical malpractice insurance from The Nemours Foundation Self-Insurance Trust Fund to cover his medical malpractice liability. That coverage included medical malpractice claims in New Jersey as well as Delaware.

Analyzing the choice of law issue under New Jersey's governmental interest test, the District Court determined that Delaware law was applicable and that, as a result, Warriner's claims were time-barred under Delaware's tort statute of limitations. The District Court reasoned that New Jersey's primary interest in the case arose out of Warriner's New Jersey residence, and that that interest was greatly attenuated because New Jersey had no connection to the events and conduct giving rise to the lawsuit. By contrast, the District Court observed that all of the events and conduct giving rise to the litigation occurred in Delaware, and Delaware had a strong, clearly stated policy interest in protecting its health care providers through its statute of limitations. In addition, it rejected Warriner's argument that New Jersey's statute of limitations and its minor tolling provision should apply because Dr. Stanton retained a New Jersey medical license and was affiliated with a pediatric practice in New Jersey. It observed that Dr. Stanton was not licensed in New Jersey at the time the Warriners began seeing him in Delaware, and he did not see any patients in New Jersey until nearly two years after the alleged negligent surgery in this case. The District Court concluded that Delaware's strong governmental interest in seeing its law applied to torts alleged to have occurred within its borders, committed by physicians

5

practicing within those borders, predominated and granted defendant's motion for summary judgment.

Warriner filed a timely appeal.

## II. Statement of Jurisdiction and Standard of Review

Plaintiffs initially filed an action in New Jersey state court. Defendants removed the action to the United States District Court for the District of New Jersey under 28 U.S.C. §§ 1332 and 1441. We have appellate jurisdiction over the final judgment of the District Court pursuant to 28 U.S.C. § 1291.

In reviewing a grant of summary judgment, we apply the same standard the district court was required to use initially. *Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 76 (3d Cir. 1990). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The sole issue before us on appeal, the District Court's interpretation and application of New Jersey's choice of law rules, is a purely legal one and therefore subject to plenary review. *Simon v. United States*, 341 F.3d 193, 199 (3d Cir. 2003).

## III. Discussion

A.    New Jersey's Governmental Interest Test

It is well established that in a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). This diversity action was initiated in the United States District Court for the District of New Jersey, so the District Court

6

properly turned to New Jersey's choice of law rules. In tort cases, New Jersey has rejected the strict *lex loci delicti* rule for determining choice of law based on the place where the wrong occurred and replaced it with the more flexible "governmental interest" test.[2] *E.g.*, *Veazey v. Doremus*, 510 A.2d 1187 (N.J. 1986); *Pfau v. Trent Aluminum Co.*, 263 A.2d 129 (N.J. 1970); *Mellk v. Sarahson*, 229 A.2d 625 (N.J. 1967). Applying that test, the determinative law is "that of the state with the greatest interest in governing the particular issue." *Veazey*, 510 A.2d at 1189. The governmental interest analysis is fact-intensive: "Each choice-of-law case presents its own unique combination of facts – the parties' residence, the place and type of occurrence and the specific set of governmental interest – that influence the resolution of the choice-of-law issue presented." *Erny v. Estate of Merola*, 792 A.2d 1208, 1221 (N.J. 2002).

Factors drawn from § 145 of the *Restatement (Second) of Conflicts of Law* (1971) guide New Jersey courts in applying the governmental interest test in tort cases. *See Fu v. Fu*, 733 A.2d 1133, 1140-41 (N.J. 1999). Those factors are grouped as

---

[2]Until *Heavner v. Uniroyal, Inc.*, 305 A.2d 412 (N.J. 1973), the New Jersey governmental interest approach applied only to choices of substantive law. Procedural matters, such as the appropriate statute of limitations, were governed by forum law. In *Heavner*, the New Jersey Supreme Court abandoned the "mechanical rule" that the New Jersey statute of limitations still applied in cases where a foreign substantive law was chosen, in an attempt to discourage forum shopping. Instead, New Jersey "borrows" the statute of limitations of the state whose substantive law applies to the case. *Heavner,* 305 A.2d at 418.

follows: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." *Id.* The most important of those factors in the context of a tort claim is the competing interests of the states. *Id.* at 1141. As discussed by the New Jersey Supreme Court in *Fu*, the initial focus "should be on what policies the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, whether these concerns will be furthered by applying that law to the multi-state situation." *Id.*

*Fu* also provides guidance in approaching the other four factors. First and foremost, in evaluating the competing interests of the states and interstate comity, "the most significant factor[s] in the tort field," *id.* at 1142, a court must consider "whether application of a competing state's law would frustrate the policies of other interested states." *Id.* at 1141. Second, in considering the goals of tort law, a court should measure "the degree to which deterrence and compensation, the fundamental goals of tort law, would be furthered by the application of a state's local law . . . ." *Id.* However, "because every tort rule, to some extent, is designed both to deter and to compensate, it is necessary to evaluate on a case-by-case basis the relative weight of those underlying purposes with respect to a specific rule." *Id.* The remaining two factors – the interests of the parties and judicial administration – are much less significant in the analysis. *Erny*, 792 A.2d at 1217. "The protection of the parties' justified expectations, a factor of extreme importance in the field of contracts, ordinarily plays little or no part in a choice-of-law question in the field of torts." *Fu*, 733 A.2d at 1141. This is so because "a person who causes an unintentional

8

injury is not necessarily aware of the law that may be applied to the consequences of his actions." *Id*. In addition, to the extent the interests of judicial administration conflict with a strong state policy, "that factor must yield." *Id.*

The governmental interest inquiry proceeds in two steps. The first step involves determining whether an actual conflict of law exists between the states involved, *Veazey*, 510 A.2d at 1189, because "where the application of either state's law would yield the same result, no conflict exists to be resolved." *High v. Balun*, 943 F.2d 323, 325 (3d Cir. 1991). In this case, the parties do not dispute that an actual conflict of law exists. The District Court was faced with the election of a statute of limitations from two possible options – Delaware's statute of limitations, under which plaintiff's claim was time-barred, or New Jersey's statute of limitations, under which the claim was not time-barred because of a tolling provision that preserves a minor plaintiff's claim until the minor reaches the age of eighteen. Since there is no question in this case that an actual conflict exists, we devote our analysis to the second element of the governmental interest inquiry which requires that we "identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties." *Veazey*, 510 A.2d at 1189.

B. Policy Interests Underlying Each State's Statute of Limitation

Looking at the policies that underlie the respective state statutes of limitation that are in conflict in this case, we find that the District Court correctly identified the relevant policy concerns of both New Jersey and Delaware. With respect to the New Jersey statute, we have consistently "identified New

9

Jersey's policies in a tort context as consisting primarily of compensation and deterrence." *Schum v. Bailey*, 578 F.2d 493, 496 (3d Cir. 1978). In addition, the New Jersey statute of limitations, N.J. Stat. § 2A:14-2, including as it does a minor tolling provision, evinces a desire on the part of New Jersey to protect "minors who are presumably not well-versed in legal matters from the adverse consequences of their inexperience." *LaFage v. Jani*, 766 A.2d 1066, 1075 (N.J. 2001) (citation omitted).

We can assume Delaware's statute of limitations, Del. Code Ann. tit. 18, § 6856, shares New Jersey's interest in compensation and deterrence, "[b]ecause every tort rule, to some extent, is designed both to deter and to compensate." *Fu*, 733 A.2d at 1141. However, Delaware's statute was enacted by the Delaware legislature with an additional policy concern in mind, namely concern over a perceived crisis in health care associated with medical malpractice claims. The Delaware Medical Malpractice Act was enacted in 1976 "due to the concern over the law at that time and the rising costs of malpractice liability insurance," and specifically addressed the applicable statute of limitations for medical malpractice claims. *Meekins v. Barnes*, 745 A.2d 893, 895-96 (Del. 2000). The statute of limitations was designed to provide "an atmosphere in which the number of suits and claims of malpractice, as well as the size of judgments and settlements, would be reduced thereby reducing the cost and/or maintaining the availability of medical malpractice insurance for health care providers." *Miller v. Spicer*, 822 F. Supp. 158, 172 (D. Del. 1993); *see* 60 Del.Laws ch. 373 (1976).

The introductory paragraphs of the 1976 Act elaborate at length on the policy goals of the legislation, indicating that the

10

main reason for passage of the legislation was the concern over the rising cost of malpractice liability insurance. 60 Del.Laws ch. 373.[3] The two-year statute of limitations was designed "to eliminate the uncertainty created by [an] open-ended period of limitations." *Dunn v. St. Francis Hospital, Inc.*, 401 A.2d 77, 79 (Del. 1979) (quoting *Report of the Delaware Medical Malpractice Commission*, pp. 3-4 (Feb. 26, 1976)). The Delaware legislature concluded that the uncertainty created by an open-ended statute of limitations was not only harmful to health care providers but was also leading to the withdrawal of health care liability insurers from the state, thus "endangering the ability of the citizens of Delaware to continue to receive quality health care as well as adequate and just compensation for negligent injuries . . . ." Preamble to 60 Del.Laws ch. 373 (1976). To address these various policy concerns, the Delaware Medical Malpractice Act modified the applicable statute of

---

[3]The Delaware Legislature found, in part, that "the number of suits and claims for damages both in Delaware and throughout the Nation as well as the necessary costs of defense and the size of judgments and settlements thereon, arising from professional patient care have increased tremendously in the past several years; and . . . there has been a tremendous increase in the cost of liability insurance coverage for health care providers in Delaware, and in some instances the withdrawal of liability insurance companies from the business of insuring health care providers in Delaware, endangering the ability of the citizens of Delaware to continue to receive quality health care as well as adequate and just compensation for negligent injuries . . . ." Preamble to 60 Del.Laws, ch. 373 (1976).

11

limitations for medical malpractice claims and settled on a two-year statute of limitations.

C.     Relevant Contacts and their Relationship to the Policy Interests of Each State

Having identified the governmental policies underlying each state's statutes of limitation, we must next determine "how those policies are affected by each state's contacts to the litigation and to the parties." *Veazey*, 510 A.2d at 1189. "[I]f a state's contacts [with the transaction] are not related to the policies underlying its law, then that state does not possess an interest in having its law apply." *Id.* This part of the inquiry involves an examination of whether the states' contacts to the litigation align with the policies identified. *Erny*, 792 A.2d at 1216.

In evaluating the contacts in a choice of law context, the New Jersey Supreme Court has adopted the approach taken by the *Restatement (Second) of Conflict of Laws* ("*Restatement*") (1971). *Fu*, 733 A.2d at 1152 ("Thus, New Jersey now adheres to the method of analysis set forth in *Restatement* . . . ."). Section 145(2) of the Restatement sets forth a list of contacts that are the most pertinent to the governmental-interest test: these are (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any between the parties is centered. In this case, those contacts as stipulated by the parties are as follows:

1.     Warriner's alleged injury occurred in Delaware.

12

2. Dr. Stanton's alleged tortious conduct occurred in Delaware.

3. Warriner is domiciled in New Jersey; The Nemours foundation is incorporated in Florida with its principal place of business in Wilmington, Delaware.

4. Warriner's ten-year patient-doctor relationship with Dr. Stanton was based at DuPont Children's Hospital in Wilmington, Delaware. Dr. Stanton never treated Robert in New Jersey.

Apart from those contacts listed in § 145(2), two additional contacts exist between the parties and the respective states:

5. Dr. Stanton became licensed in New Jersey in 1995 in order to facilitate collection of payments from New Jersey, one year prior to the alleged malpractice. He did not see patients in New Jersey until two years after the alleged malpractice.

6. In 1997, the year following the accident, The Nemours Foundation entered into a pediatric partnership with AtlanticCare in Southern New Jersey. Dr. Stanton was a pediatric specialist employed at the partnership from September 1998 through May 2001. He was listed in a professional staff directory as an orthopedic specialist available for appointments in New Jersey.

13

Examining these respective contacts, we find the District Court did not err in concluding Delaware law applied. It correctly placed special emphasis in this case on the fact that all of the contact between Warriner and Dr. Stanton occurred in Delaware. In personal injury cases, the New Jersey Supreme Court has counseled that "the place where the injury occurred is a contact that, as to most issues, plays an important role in the selection of the state of the applicable law." *Fu*, 733 A.2d at 1142 (quoting *Restatement*, § 145 cmt. e). Furthermore, it has explained that "[w]hen both conduct and injury occur in a single jurisdiction, with only 'rare exceptions, the local law of the state where conduct and injury occurred will be applied' to determine an actor's liability." *Id.* (quoting *Restatement*, § 145 cmt. d). This general rule is followed because "a state has an obvious interest in regulating the conduct of persons within its territory and in providing redress for injuries that occurred there." *Id.* In this case, both the allegedly tortious conduct and injury occurred in Delaware. In fact, Warriner's entire treatment history – beginning a mere twelve days after his birth and extending over nearly a decade – was based in Delaware and undertaken by a Delaware doctor. Each of these contacts is relevant to Delaware's stated public policy of providing a finite period of time for medical malpractice claims to require plaintiffs to file timely claims, particularly when those injuries occur within the State of Delaware. Most importantly, considering the interests of interstate comity, it is apparent that the application of New Jersey's statute of limitations in this case would directly contravene Delaware's clearly articulated interest in shielding its health care providers from liability for a claim that, under its own considered judgment, expressed through its statute of limitations, is unquestionably stale. *See Erny*, 792 A.2d at 1217

14

("When considering the interests of interstate comity, a court must determine whether application of a competing state's law would frustrate the policies of other interested states.") (quoting *Fu*, 733 A.2d at 1141).

Furthermore, the fact that all the contacts occurring in this case were in Delaware takes on even greater significance considering that they were not fortuitous but rather intentionally initiated by the Warriners themselves. *Id.* ("The place of injury becomes less important where it is simply fortuitous."). Warriner elected to travel to Delaware from 1989 until 1998 for specialized medical treatment and, even after his final surgery with Dr. Stanton in 1996 and the establishment of a Nemours-related facility in New Jersey in 1997, continued to receive medical treatment in Delaware. In the context of a doctor-patient lawsuit, we have observed that "it is only fair that the law of the state to which the patient has voluntarily traveled, and in which the doctor has chosen to [practice], be applied to adjudicate the respective rights, duties, and obligations between the parties." *Blakesley v. Wolford*, 789 F.2d 236, 243 (3d Cir. 1986). In addition, although Warriner was a resident of New Jersey at the time of the alleged malpractice, "citizens do not . . . carry their home state's laws with them wherever they go." *Amoroso v. Burdette Tomlin Memorial Hosp.*, 901 F. Supp. 900, 906 (D.N.J. 1995). Indeed, it is hornbook law that "by entering the state . . . the visitor has exposed himself to the risks of the territory and should not expect to subject persons living there to a financial hazard that their law had not created." *Id.* (quoting D. F. Cavers, *The Choice of Law Process* 146-47 (1965)).

We agree with the Warriners that the fact that Dr. Stanton was licensed in New Jersey prior to the accident is relevant to

15

New Jersey's public policy goals of deterring tortious conduct and providing compensation for victims of such conduct. However, as stipulated by the parties, Dr. Stanton's New Jersey license was obtained at the instruction of his employer in order to facilitate payments rather than for the purpose of practicing medicine in New Jersey. And while Dr. Stanton did eventually begin to see patients in New Jersey, it was not until two years after the date of the alleged malpractice involving Warriner. Placed in proper perspective, Dr. Stanton's limited contact with New Jersey at the time of Warriner's injury pales in comparison to the overwhelming number of contacts with Delaware in this case, and the exceedingly strong and clearly articulated public policy interest of Delaware in having its law apply to those contacts.

In addition, Delaware's statute of limitations, like all tort rules, also implicitly reflects a policy interest in deterring tortious conduct and providing compensation to injured victims, and Delaware's own judgment is on equal footing with New Jersey's as to how long its health care providers should be exposed to liability to adequately serve the goals of compensation and deterrence. *Fu*, 733 A.2d at 1141 ("Rules . . . that deny liability are entitled to equal consideration in choice-of-law determinations as are rules imposing liability."). On balance then, it was not erroneous for the District Court to accord relatively little significance to the fact that Dr. Stanton has been licensed in New Jersey.[4]

_____

[4]We do not disagree with the dissent that the fact that Dr. Stanton was licensed in New Jersey is a contact of some significance. However, we do believe the significance of this

16

It is certainly true that New Jersey has a policy interest in safeguarding the welfare of minors and ensuring they are compensated for their injuries. And while we agree with Warriner that this interest is very substantial, we do not agree that this interest should in effect trump all other factors in the governmental interest analysis. Warriner suggests that the substantial weight New Jersey affords this particular interest is "confirmed by the overriding weight our courts ascribe to a child's New Jersey domicile and residency in the choice of law analysis." *Br. of Appellant*, at 17 (quoting *Black v. Walker*, 684 A.2d 1011, 1017 (N.J. Super 1996)). The authority cited by Warriner here, however, is taken entirely out of context and is unpersuasive.[5] In *Black v. Walker*, *supra*, a New Jersey appellate court concluded that "family-law precedent . . .

---

fact is diminished in light of the overwhelming number of Delaware contacts in this case.

[5]We note appellants fail to cite case law from the New Jersey Supreme Court for many of their propositions, including the one discussed here. In construing state law, "we must determine how the highest court of the State would decide an issue." *Commissioner of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 464-465 (1967). In diversity cases, the decisions of lower state courts "while attributed some weight, are not controlling where the highest court of the state has not spoken on the point . . . . If there be no decision by that court then [we] must apply what [we] find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State. In this respect, we may be said to be, in effect, sitting as a state court." *Id.* at 465 (citations omitted).

17

confirms the overriding weight our courts ascribe to a child's New Jersey domicile and residency in the choice-of-law analysis." *Id.* (emphasis added). As the full quote, as opposed to the excised version cited by Warriner, makes clear, the appellate court in *Black* was considering choice of law in the context of family law, more specifically in the context of child-support payments, an area in which it is apparent, indeed patently obvious, that the interests of a minor are of paramount concern. This case is therefore of little value to the analysis in the present case. In the specific context of a torts choice of law analysis, we find no authority, and appellants have cited none, suggesting in effect that a state's interest in compensating its minors, as opposed to other victims of tortious conduct, should "unequivocally outweigh" all other policy considerations.[6]

---

[6]Similarly, we do not find persuasive the cases cited by the dissent in support of the proposition that New Jersey's compensation interest is a trump card in the analysis. Unlike the case before us, these cases reveal no true conflict between New Jersey's compensation interest and the policies of the other states involved. *See Pine v. Eli Lilly & Co.*, 492 A.2d 1079, 1083 (N.J. Super. Ct. App. Div. 1985) (applying NJ law but stating "[w]e are unable to conclude that New York has any compelling interest in having its statute of limitations apply here to defeat recovery by plaintiff"); *Dent v. Cunningham*, 786 F.2d 173, 176 (3d Cir. 1986) ("Both New Jersey's and California's policies in a tort context consist primarily of compensation and deterrence. . . . [W]e conclude that application of New Jersey law would in no way interfere with California's interests in deterrence and compensation."). In cases such as these, where there are no "*competing* state interests" to be balanced, we

18

Consequently, while we give this factor due consideration and accord it substantial significance, we still must view it in light of all the policy concerns implicated by the facts before us. And as substantial as this particular interest may be, when put on the scales opposite Delaware's extraordinarily strong interests in this case, it fails to outweigh them.

Finally, appellants rely heavily on our decision in *Schum v. Bailey*, *supra*, arguing it is virtually indistinguishable from the case before us and should therefore light our way. While *Schum* does in fact confirm "New Jersey's strong interest in protecting the compensation rights of its domiciliaries" as well as New Jersey's interest in deterring tortious conduct on the part of medical practitioners, *Schum*, 578 F.2d at 496-97, we agree with the District Court that it is distinguishable from the case before us.

In *Schum*, a New Jersey resident filed a medical malpractice claim against her New York physician for tortious conduct occurring in New York. All of the defendant's services, including the surgery at issue, were performed in New York, the state in which the defendant maintained his major practice. Applying the governmental interest test, we determined that New York's interests in compensating its own domiciliaries and deterring future misconduct were the same as New Jersey's, and that the interests of both states would be adequately served by application of New Jersey law. *Id.* at 496 ("Having identified the relevant policies, and, having examined them in light of this factual context, it becomes evident that both policies would be

readily concede that New Jersey's compensation interest may emerge as "paramount."

19

served by the application in this case of New Jersey's own law.").

Thus, the key to understanding *Schum* and how it is distinguishable from the case before us is that in *Schum*, there was no true conflict between the policies of the states of New York and New Jersey. *Id.* at 497 ("[S]ince [the] record reveals *no conflict* between New York and New Jersey insofar as the application of their substantive laws is concerned, and since the record also reveals that New Jersey has a substantial interest in the application of its own law, we conclude that New Jersey, as an interested forum, would apply its own law of liability.") (emphasis added).[7] *Schum* merely reaffirms that "[i]f a strong state policy or interest will be neither fostered by applying that state's law, nor frustrated by the failure to apply it, it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law." *White v. Smith*, 398 F. Supp. 130, 134 (D.N.J.1975). *See also General Ceramics v. Firemen's Fund Ins. Cos.*, 66 F.3d 647, 656 (3d Cir. 1995) ("A multistate conflict of laws exists only when contacts are distributed such that more than one state wants to regulate the case.") (citations omitted). By contrast, in this case, as already discussed at

---

[7]Contesting our conclusion that *Schum* is distinguishable from our own case for this reason, the dissent cites dicta from the concurrence in *Schum*, finding there was indeed a conflict between New York and New Jersey in having their laws applied. *See Schum*, 578 F.2d at 501-02 (Gibbons, J., concurring). We cite the majority opinion and find it more persuasive on this particular point.

20

length, there is a clear and substantial conflict between the concerns of New Jersey's and Delaware's law with respect to the statute-of-limitations issue. The outcome in this case, therefore, is not prescribed by *Schum*, as Warriner has so persistently argued before the District Court and our own Court.

## IV. Conclusion

The District Court did not err in its application of New Jersey's governmental interest choice of law rule. Nearly all of the relevant contacts in this medical malpractice case occurred in Delaware – the allegedly tortious conduct, the injury, and a decade long course of treatment involving numerous trips to a physician based in Delaware and operating out of Delaware. In addition, Delaware has a clearly articulated policy interest in regulating malpractice claims through its statute of limitations. These factors overwhelmed any interest New Jersey had in this case by virtue of Warriner's status as a New Jersey resident and the defendant's limited professional connection to the state at the time of injury. Performing the balancing act required by the governmental interest test, the District Court did not err in determining that Delaware's statute of limitations applied to the claim in this case. It therefore did not err in concluding the defendant was entitled to judgment as a matter of law.

For the reasons stated, we will affirm the judgment of the District Court.

21

BRIGHT, dissenting.

I respectfully dissent from the majority's opinion because New Jersey's interest in providing a right of action for compensation to its resident child in this case justifies application of New Jersey's statute of limitations. N.J. Stat. § 2A:14-2 tolls the applicable statute of limitations for minors until the minor reaches the age of majority. Del. Code. Ann. tit. 18, § 6856 tolls the statute of limitations for minors until the minor reaches the age of six years. Robert Warriner is a minor over the age of six years old, and therefore, the district court's application of Delaware's statute of limitations proved fatal to his cause of action against Stanton and the hospital parties.

In this instance, the majority does not assign sufficient weight to New Jersey's compensation interest. A review of the cases in New Jersey and in this circuit shows one consistent result: New Jersey's statute of limitations, when longer, is applied in lawsuits for injuries occurring in another state when brought in New Jersey by New Jersey residents. For example, in Warner v. Auberge Gray Rocks Inn, Ltee., 827 F.2d 938, 942 (3d Cir. 1987), this court applied New Jersey's statute of limitations when a New Jersey resident sued a Canadian entity for an injury that occurred in Quebec. Quebec's one-year statute of limitations had run prior to the commencement of the suit and New Jersey's longer statute of limitations had not. Id. at 940. When applying New Jersey's statute of limitations, the court focused on New Jersey's significant interest in providing a right of compensation for its residents. See id. at 941-42. Likewise, in Schum v. Bailey, 578 F.2d 493 (3d Cir. 1978), this court applied New Jersey law when a New Jersey plaintiff brought an action against a New York doctor for malpractice alleged to

22

have occurred in New York.[8]  See id. at 497.  Because New York did not have an applicable discovery rule (relating to when the statute of limitations begins to run) and New Jersey did, application of New York's law, as in the instant case with Delaware's law, would have been fatal to plaintiff's claim.  See id. at 494-95.

Similarly, in Pine v. Eli Lilly & Co., 492 A.2d 1079 (N.J. Super. Ct. App. Div. 1985), the plaintiff's residence constituted the only contact with New Jersey.  Notably, the plaintiff had established residence in New Jersey after discovering his potential claim would be time barred in New York.  Id. at 1081-82.  The court determined that New Jersey's interest in compensating its own domiciliaries was paramount and outweighed other governmental interests, even though the "'factual contacts' prong of the governmental interest test alone would require the 'borrowing' of New York's limitations statute[.]"  Id. at 1083; see also Dent v. Cunningham, 786 F.2d 173, 176, 177 (3d Cir. 1986) (New Jersey's longer statute of limitations applied despite significant California contacts because of New Jersey's substantial interest in compensating its own domicilairies).

---

[8]The majority distinguishes this analogous precedent by explaining, as the district court did, that "in Schum, there was no true conflict between the policies of the states of New York and New Jersey."  I disagree.  See Schum, 578 F.2d at 501-02 (Gibbons, J., concurring) (finding the existence of a conflict between New York's interest in the cost of health care and New Jersey's compensation interest).

23

Moreover, the majority exaggerates the impact on Delaware's interest in shielding health care providers from stale claims by focusing on Delaware's statute of limitations for medical malpractice claims rather than on the relevant tolling provisions applicable to the claims of minors.  Both Delaware and New Jersey have expressed a policy of protecting minors by enacting minor tolling measures.  See N.J. Stat. § 2A:14-2 (tolling until minor reaches age of majority, but prior to child's thirteenth birthday for medical malpractice claims for injuries sustained at birth); Del. Code. Ann. tit. 18, § 6856 (tolling until minor reaches age of six years).  Although applying the longer of the two provisions would impact Delaware's policy *more* than applying the shorter provision would, this presents a question of *degree of impact*, not, as the majority describes, a "direct contravention" of Delaware's interest.

In this case, also, Stanton and the hospital parties maintained sufficient contacts with New Jersey residents to create an expectation that they might be subject to New Jersey laws.  Notably, Stanton held a license to practice medicine in New Jersey at the time of the injury.  The majority attempts to minimize these contacts by explaining that Stanton held a license only for the purpose of collecting payments from the state of New Jersey for medical treatments for New Jersey patients.  Yet, this reason for Stanton's contacts does not diminish them.

Of particular concern is that the alleged malpractice in this case happened to a child.  Both Delaware and New Jersey, by tolling their statutes of limitations as applied to minors, have expressed a policy to permit children an extended opportunity to recover for their injuries.  Here, this policy expressed by both

24

states requires a conclusion asserting the primacy of the longer New Jersey statute of limitations to protect the rights of the injured child.